# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| TRIKONA ADVISERS LIMITED and<br>ASIA PACIFIC INVESTMENTS LTD,<br><br>    Plaintiffs,<br><br>v.<br><br>RAKSHITT CHUGH,<br>PEAK XV CAPITAL ADVISERS, LLC,<br>PEAK XV CAPITAL, LLC,<br>PEAK XV GP, LLC,<br>PEAK XV Fundamental Value,<br>Limited Partnership,<br>ARC CAPITAL, LLC,<br>RAKSHITT CHUGH, Trustee<br>of the RC FAMILY TRUST, and<br>BYTE CONSULTING, INC.,<br><br>    Defendants. | Civil Action No. 3:11cv2015(MRK)<br><br><br><br>__VERIFIED COMPLAINT__ |

## INTRODUCTION

Asia Pacific Investments Ltd. ("Asia Pacific"), at all relevant times a shareholder of Trikona Advisers Limited ("TAL"), and who now holds fifty per cent of all of the shares of TAL, brings this action derivatively and on behalf of TAL, and against Rakshitt Chugh ("Chugh"), who at all relevant times was a senior executive of TAL, holding the titles of Co-Managing Director and Member of the Board of Directors, for willful, material, severe, repeated and ongoing breaches of the fiduciary duty that Chugh owes to TAL. Chugh's breaches of fiduciary duty owed to TAL have included: appropriating TAL's prospective customers lists, funds, and equipment; competing directly against TAL; refusing after repeated demands to disclose his support of the actions of third

1

parties who sought to damage TAL and who, with Chugh's substantial aid, did damage

TAL; blocking TAL's defense of a corporate takeover and multiple litigations; barring

TAL from developing new business; and shutting down TAL's existing businesses. As a

remedy for Chugh's willful, catastrophic and chronic breaches of his fiduciary duty, Asia

Pacific and TAL seek to have all of the stock, assets and profits of his competing

companies, the Peak XV Entities, held in constructive trust for the benefit of Asia Pacific

and TAL, and then disgorged and/or forfeited absolutely to Asia Pacific and TAL. Asia

Pacific and TAL also seek the same equitable remedies with respect to Chugh's interest

in the stock of TAL itself, that is, that his interest and that of any related parties holding

TAL's stock for his benefit, be held in constructive trust, and then disgorged and/or

forfeited absolutely to Asia Pacific and TAL. Asia Pacific and TAL also seek the same

equitable remedies with respect to all other assets of Chugh, and that of any related

parties holding such assets for his benefit, that is, that such assets entirely and completely

be disgorged and/or forfeited absolutely to Asia Pacific and TAL.

> As stated below, Aashish Kalra, also a Co-Managing Director and Member of the

Board of Directors, along with counsel for Asia Pacific, repeatedly warned Chugh that

his breaches of fiduciary duty would result in an action against him. Chugh, owning

and/or controlling fifty per cent of all of the shares of TAL, blocked, thwarted, and

vetoed any corporate action against him and constantly threatened suit against those who

advocated such actions.

## PARTIES

1.  TAL is a corporation with a place of incorporation in the Cayman Islands and

with a principal place of business in New Delhi, India.

2.      Asia Pacific is a corporation with a place of incorporation in the British Virgin Islands and with a principal place of business in Geneva, Switzerland.

3.      Rakshitt Chugh ("Chugh") is a natural person and is resident at 736 Valley Road, New Canaan, Connecticut.  Chugh was at all times relevant a co-Managing Director of Trikona Advisers Limited.

4.      Peak XV Capital Advisers, LLC is a limited liability company with a place of incorporation in Delaware on October 7, 2009, and with a principal place of business at 43 Berkeley Square, London, United Kingdom.

5.      Peak XV Capital, LLC is a limited liability company with a place of incorporation in Delaware on May 11, 2010, and with a principal place of business at 43 Berkeley Square, London, United Kingdom.

6.      Peak XV GP, LLC is a limited liability company with a place of incorporation in Delaware on May 11, 2010, and with a principal place of business at 43 Berkeley Square, London, United Kingdom.  It is the managing member of Peak XV Capital, LLC.

7.      Peak XV Fundamental Value, Limited Partnership is a Delaware limited partnership entered into on May 11, 2010.  The General Partner is Peak XV GP, LLC.

8.      ARC Capital, LLC ("ARC") is a corporation incorporated in Delaware and which has a principal place of business at 736 Valley Road, New Canaan, Connecticut. ARC holds, directly and/or indirectly, along with the RC Family Trust (described just below) and Chugh himself (collectively, the "Chugh Entities"), for the ultimate benefit of Chugh and his family, 50% of the total shares of TAL.

9.     Chugh is a Trustee of the RC Family Trust, which Trust, along with Chugh, owns all of the shares of ARC.

10.     Byte Consulting, Inc. is a corporation incorporated in Delaware and which has a principal place of business in New York or New Canaan, Connecticut.

## JURISDICTION

11.     Subject matter jurisdiction is proper in this Court based on 28 U.S.C. § 1332(a) since all plaintiffs are citizens of different States or Countries than all defendants. Plaintiff TAL is a Cayman Islands corporation with a principal place of business in New Delhi, India.  And Plaintiff Asia Pacific is a corporation incorporated in the British Virgin Islands with a principal place of business in Geneva, Switzerland.

12.     Personal jurisdiction over the defendants is proper in this Court since the defendants either reside in Connecticut, and/or have a place of business in Connecticut, and/or transact business in Connecticut, and the claims in this case arose out of their contacts with Connecticut.  Defendant Chugh is a resident of Connecticut.  Byte Consulting, Inc. maintains an office at 736 Valley Road, New Canaan, Connecticut. Defendants Peak XV Capital Advisers, LLC, Peak XV Capital, LLC, Peak XV GP, LLC and Peak XV Fundamental Value, LP (collectively the "Peak XV Entities") have a place of business at 736 Valley Road, New Canaan, Connecticut, and all transact business in Connecticut.  And Chugh is also a Trustee of the RC Family Trust, which Trust is the ultimate beneficial owner of the Chugh Entities, and again, Chugh resides at 736 Valley Road, New Canaan, Connecticut.

13.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

4

at Cambridge Technology Enterprises ("CTE"), a venture capital company, located in Cambridge, Massachusetts. While at CTE, he identified and launched several highly successful public companies specializing in information technology, including a venture fund with Samsung of Korea called Cambridge Samsung Partners.

18.      In 2000, Kalra began working on a plan to foster development and economic growth in India.  By 2004, he had created the key ideas and business plan for this project and started to present his plan to the market.

### Rakshitt Chugh

19.      Chugh was raised in India and also attended the Doon School, although he and Kalra did not graduate in the same class.  Following his graduation from the Doon School, Chugh attended Middlebury College and graduated with a Bachelor's degree in Economics, with a concentration in Intensive Physics.

20.      Until early 2000, Chugh worked in the fixed income structuring group at Lehman Brothers in New York, New York.  A majority of his work at Lehman Brothers focused on real estate asset-backed financing, including commercial and residential asset-backed transactions.

21.      In 2000, Chugh started Byte Consulting, a data and financial analysis consulting firm based in New Canaan, Connecticut and New York.

### Formation of Trikona Advisers Limited (TAL)

22.      In 2000, Kalra began working on building an investment management and advisory company focused on encouraging and facilitating investment into the rapidly expanding real estate and infrastructure markets in India.  Kalra was extremely passionate about increasing investment in India to aid in its growth and development.

6

23.      In late 2004 or early 2005, Kalra, who knew Chugh at the Doon School, was re-introduced to Chugh by Lokesh Chugh, Chugh's younger brother who was in the same class as Kalra.  Kalra explained to Chugh his project for establishing an investment management firm focused on real estate and infrastructure developments in India.  Chugh expressed interest in Kalra's project and represented to Kalra that through his previous work at Lehman Brothers as a fund manager, he would make a useful partner and could attract investors to raise the necessary capital for the project.  Chugh demanded a fifty-fifty division of ownership in the project since he said that he could recruit the investors he had met while he was at Lehman Brothers to invest in the new project.  He also represented that he would work full-time on the project, do an equal amount of work, and create equal, or one-half, of the value.

24.      Kalra's designated responsibility in the project was to recruit and engage development professionals and operate the investment portfolio in India.  This role required Kalra to hire Indian development managers, identify investment opportunities, close development deals, and manage the deals to full development and value realization.

25.      Chugh's designated responsibility in the project was to manage investor relations, including packaging the investment portfolio into an attractive proposition for investors, raising the investment funds, and diversifying the investor base to stabilize the project.

26.      On March 9, 2006, the project was launched when Trikona Advisers Limited ("TAL"), the investment advisor and manager for the project, was incorporated in the Cayman Islands.  TAL's share capital is $50,000 divided into 50,000 shares of par value of $1.00 each.  Fifty percent of TAL is owned by Asia Pacific, representing the

## VENUE

14.      Venue is proper in this district under 28 U.S.C. § 1391.  The United States District Court for the District of Connecticut has the following connections to this dispute: it is the place where the principal defendant, Chugh, has at all relevant times resided; it is where Chugh, as an officer and director of the Peak XV Entities, resides and has a place of business; it is where the Peak XV Entities conduct business through Chugh, their officer and director; it is also where Chugh, Trustee of the RC Family Trust and ultimate beneficial owner of the Chugh Entities, resides.

## STATEMENT OF FACTS

### Aashish Kalra

15.      Kalra is part of a well-connected family that has played an important role in the business community and charitable organizations of India.  The Kalra family has long had a role in promoting India's growth and success and that long-standing role served as the impetus for establishing a vehicle for facilitating investment in India, which vehicle eventually became TAL, one of the plaintiffs in this case.

16.      Kalra attended the Doon School in India, an exclusive school for boys from Grade 7 through Grade 12.  Following his graduation from the Doon School, Kalra attended St. Stephen's College in Delhi, one of India's most prestigious colleges, graduating in 1993 with a B.A. in Economics, with Honors.  He also did Master's course work at the very well known Delhi School of Economics.  In 1996, Kalra earned an M.S. in Economics and International Finance at Brandeis University in Waltham, Massachusetts.

17.      Immediately after obtaining his Master's degree, Kalra became a partner

Kalra family's interests.  The remaining 50% is owned by the Chugh Entities,

representing Chugh's interests and of which Chugh is the ultimate beneficial owner.

Operational control of TAL was vested in its Managing Directors, with Kalra and Chugh

each appointed as a co-Managing Director of TAL.  Thus, together they had operational

control over TAL, with both having equal authority.  Ultimate governing authority of

TAL was vested in a board of directors.  Kalra and Chugh were always on the board of

directors.  Other members of the board of directors varied but the two current other

members of the board of directors are Board Chair, Saurabh Killa, currently resident in

Dubai, and Director Ravindra Chitnis, also resident in Dubai.

27.      Kalra's and Chugh's goal was for TAL not only to act as an investment

adviser and asset manager for a fund company established by TAL, called TTC and

which is described just below, but also for a family of fund companies investing in

different sectors of Indian real estate and infrastructure.  The eventual plan was for TAL

to become a global investment management firm, like the Carlyle Group and the

Blackstone Group, but focused on investments in India and emerging markets.

**Formation of Trikona Trinity Capital (TTC)**

28.      A holding company was established by incorporating Trikona Trinity

Capital ("TTC") in the Isle of Man on March 26, 2006.  TTC is a public limited company

that was incorporated for the purposes of acting as a parent holding company owning and

operating subsidiary operating companies in India that acquired, developed and sold real

estate property, infrastructure and developments.  TTC was the fund for investments in

the Indian real estate market, and TAL was the general manager of TTC and acted as the

investment adviser for investments made through TTC.  TAL held a seat on the TTC

board, which Chugh insisted on occupying.

29.     TTC also incorporated a company named Trinity Capital Mauritius Ltd.

("TCML").  TCML was a wholly-owned subsidiary of TTC.  TCML made investments

on behalf of TTC throughout India through various Mauritian holding companies.

30.     TTC's investment strategy, as stated directly to its investors and in its

offering documents, was to acquire and hold investments in the Indian real estate and

infrastructure markets over the long-term (10 years) so that the investments were fully

matured when profits were realized.

31.     TAL and TTC entered into a Portfolio Management Agreement ("PMA"),

pursuant to which TAL contracted to perform investment advisory services to TTC

concerning investments in the Indian real estate and infrastructure markets.  TTC agreed

to compensate TAL for those services.  The term of the PMA was to run until April 21,

2016.  TAL's compensation consisted of a management fee of 2% annually, plus a profit

share fee of up to 30% of investment gains.  The PMA also provided that if the PMA was

terminated in less than ten years, that is, prior to April 21, 2016, then TAL was to be paid

a profit share fee up to 30%, depending on the level of internal rate of return of the

operating companies, with the gain to be calculated on the basis of the open market value

of the operating companies at the time of termination.  As a result of the PMA, TAL,

acting at the direction of Kalra and Chugh, became the external manager of TTC.

**TTC's Initial Public Offering and Initial Successes**

32.     Through connections Kalra had previously made at the London-based

investment bank of Numis Securities, Kalra arranged to have TTC offered through an

9

initial public offering ("IPO") on the London Alternative Investment Market ("AIM"). TTC was to be one of the very first publicly traded funds in United Kingdom or Europe specializing in investment in Indian real estate development.

33.     Kalra worked tirelessly to build interest in TTC and called on his investor contacts to invest in TTC.  The IPO was launched on April 21, 2006.  The press release also indicated the tremendous investment opportunity represented by the rapidly expanding Indian real estate market, including specifically: "India has one of the fastest growing GDP's in the world … between 2003 and 2007 GDP growth is estimated to be 6.8%"; "[i]n the Directors' opinion, significant barriers to entry and critical shortages of investment capital create the potential for high risk adjusted returns"; "Indian property development costs are among the lowest in the world"; "Yields on investments in commercial properties in Indian Metros are around 10.5% which are amongst the highest in the world"; 'Indian government policy over the last 10 years has been determined with a view generally encouraging foreign direct investments and economic development." The press release further indicated that TTC had attracted a highly experienced Chairman in Michael Cassidy, a Director of The British Land Company PLC and UBS Limited, and that TAL had a highly experienced Advisory Board member, among others, in Arthur Mirante, former President and CEO of the world-wide real estate development firm of Cushman & Wakefield.  Kalra recruited the members of TTC's board of directors and TAL's advisory board.

34.     Through the IPO, TTC raised approximately 250 million GBP, equating at that time to 465 million USD, for investment in India.

35.     As a result of the promotional effort for the IPO, TTC attracted a significant number of initial investors, including QVT Financial ("QVT"), a privately-owned hedge fund based in New York and London.

36.     These initial investors were not attracted or procured through any individual effort of Chugh, even though he had represented that he could bring substantial investors to TTC to fund the Indian projects.

37.     TTC used the IPO funds to acquire operating companies that owned and developed real estate and infrastructure in India.  TTC did this mainly by purchasing shares in or entering into partnerships with seasoned Indian developers.  One of these partnership arrangements, as shown by a press release dated August 4, 2006, was a 100 million USD co-investment with Infrastructure Leasing & Financial Services ("IL&FS"), focused on  infrastructure development in India.  IL&FS and its related companies had partnership arrangements for developing infrastructure with many Indian State Governments and with the Central Government.  On the same day, TTC also entered into a second partnership arrangement for co-investing 100 million USD in real estate developments in India with IL&FS Investment Managers Ltd. ("IIML"), a subsidiary of IL&FS and one of the largest fund management companies in India.  The two co-investment partnerships with IL&FS and IIML had a combined value of 200 million USD.

38.     Kalra's personal and family connections helped to establish these direct investment or partnership relationships with well-known existing Indian developers and established companies.  Chugh did not participate or contribute to the procurement of

these investments or partnerships, and the investee companies or partners had little or no dealings with Chugh.

39.     In order to run the operating companies in India, TAL hired a number of employees in Mumbai and New Delhi.  Many of these key employees were known to Kalra through family and personal connections in India and included high ranking Indian real estate executives such Mahesh Gandhi, ex-CEO of Jardine Fleming's asset management and unit trust operations in India and Chief Investment Officer of the Unit Trust of India, and Dr. P.S. Rana, former Chairman and Managing Director of the Housing & Urban Development Corp. with 35 years of experience in real estate and infrastructure finance and development.  Mr. Gandhi became head of TAL's office and operations in Mumbai, India.  Dr. Rana became Chairman of Panthera Developers Private Limited, a development company owned by TAL that built its own and some of TTC's real estate and infrastructure projects.

40.     TAL founded its own operating companies to acquire and develop land. These operating companies included but are not limited to Panthera Developers, Enfield Property Management Services, Sankalp, and Jodhana.

41.     Through TAL's own operating companies or through joint ventures with other companies, TTC then invested in the following real estate and infrastructure projects in India:

   (a) The Uppal IT Park "Tech Oasis" (residential, commercial and IT);
   (b) The Kapstone Construction Pvt. Ltd. Project (residential, commercial, retail and hospitality);
   (c) MK Malls (commercial);
   (d) Lady Ratan Seasons (residential);
   (e) DB Hospitality (hospitality including 5 star deluxe hotels);
   (f) Luxor Cyber City (IT/TES);
   (g) MIG GROUP IV (urban redevelopment, and residential);

12

(h) Sankalp Township (residential, commercial, retail, hospitality and healthcare);

(i) Jodhana (residential villas and commercial development including handicrafts space);

(j) Virar Township (residential, commercial, high street retail and retail mall);

(k) DBR – Real Estate Company (IPO);

(l) Pipavav Shipyard Ltd. (IPO);

(m) ITNL - IL&FS Transportation Networks Ltd. (IPO);

(n) Manjeera – Hyderabad (mall and residential);

(o) Fortis Hospitals (IPO);

(p) Phoenix Mills Limited (retail, commercial and hospitality) (IPO); and

(q) Horizon Country Wide Logistics Limited (infrastructure).

42.     The successes of TAL and TTC mounted.  Their successes in attracting investors, recruiting high ranking and experienced real estate executives, and creating new real estate projects in India were documented in many press releases.  Kalra's particular successes in connection with TAL and TTC were also set forth in many news articles.

43.     By August 2008, a little more than two years after the launch of TAL, as shown on a TAL document entitled Trikona Trinity Capital Investor Financing Opportunity, dated August 2008.  TAL had almost 1 billion USD under management, 50 employees, offices in New York, London, Delhi, and Mumbai, and had completed realizations on invested capital of over 100%.

**TAL's Efforts to Reduce Risk and Expand Assets**

44.     After the IPO, Kalra wanted to raise additional funds to reduce or replace hedge fund investors, such as QVT, and for further investments in India to be managed by TAL.  He was concerned that hedge fund investors in general were short-term investors, and that QVT in particular had a history of forcing short-term liquidation of planned long-term investments.  QVT employed a strategy of engaging in asset-stripping, that is, acting together with other hedge funds to take over the boards of fund companies

in which they had invested, reversing the long-term investment objectives of such companies, and then liquidating the company's long-term investments for an immediate cash return to shareholders. For the express purpose of reducing risk and increasing overall assets under management, Kalra and Chugh agreed that Chugh would use a budgeted amount of TAL's funds to find stable new long-term investors, such as pension funds and insurance companies, to stabilize TTC and replace the hedge fund investors, and for recruiting investors to invest in additional new fund companies, in addition to TTC, that TAL envisioned. This effort would primarily include the development of a substantial database of potential prospects for large-scale investment in Indian real estate and infrastructure.

45.     Instead of using a mutually budgeted amount of TAL funds, Chugh unilaterally spent at least 10 million USD from TAL funds on the effort to increase the investor database. Chugh, despite numerous requests to date, has never provided a detailed accounting of the funds he used to create the investor database and recruit alternative investors and he even asked TAL employees not to provide this information to Kalra.

46.     Rather than attracting stable long-term investors, Chugh allowed QVT to increase its shares in TTC. Chugh also brought in more short-term perspective investors like QVT, such as Carrousel Capital ("Carrousel"), a London-based hedge fund. In addition, Chugh did not recruit any new investors for new fund companies. Thus, Chugh increased the risks presented by TTC's portfolio, rather than mitigating the risk and offering stability.

**TAL's Adviser Work Outside of TTC for Sachsenfonds**

14

47.     As part of its effort to reduce the risk posed by the hedge fund investors and to increase overall assets under management, TAL attempted to attract other investors in the economic opportunities in India.  In March 2007, TAL began meeting with Sachsenfonds GmbH ("Sachsenfonds"), a German investment company whose objectives included identifying, structuring and offering investment opportunities to German investors.  A number of meetings took place between March and August 2007 in India and Germany for the purpose of allowing Sachsenfonds to investigate possible investments in Indian developments through TAL and/or TTC.

48.     Kalra made the contact with Sachsenfonds.  Kalra knew that Sachsenfonds had entered into joint venture development arrangements with the Macquarie Group, an Australian investment management firm, for investments in Australia, and believed that similar ventures could be arranged between Sachsenfonds and TAL for investments in India.   Although Chugh claimed the title of TAL's investment manager, handling investor relations and establishing new funds, he did little work to cultivate investors or investments in TAL.  Kalra pursued the relationship with Sachsenfonds by arranging meetings in Germany and India.  Kalra created portfolios with German tax-issues specifically in mind that Sachsenfonds could sell in Germany.  Rather than support the endeavor, Chugh tried to thwart Sachsenfonds' investment.  Chugh claimed that it was not in the best interests of TAL and a conflict with TAL-related entity named TIREP.  Chugh tried to thwart the investment deals with Sachsenfonds by refusing to give his written approval, as shown by an email string beginning with an email by Chugh, dated March 10, 2008.  Chugh was so extreme in his efforts to block the Sachsenfonds investments that he caused the key employee trying to complete the investments, Sajid

Malik, to despair of the deals actually closing.  The Sachsenfonds investments finally went through, and despite Chugh's adamant efforts to block them, the bulk of TAL and TTC's financial success was derived from the Sachsenfonds' investments.

49.    Sachsenfonds did decide to partner with TAL and TTC and invest in India and continued working with Kalra to structure the investments.  Sachsenfonds started two limited partnerships in Germany, namely Immobilien Development Indien I and Immobilien Development Indien II ("Immobilien I" and "Immobilien II"), for the purpose of buying pre-invested portfolios from TTC and making investments in India.  In December 2007, Immobilien I purchased from TTC the first portfolio for approximately 32 million GBP.  In May 2008, Immobilien II purchased the second portfolio from TTC for approximately 54 million GBP and made a further co-investment with TAL of approximately 24 million GBP.  Sachsenfonds further sold Immobilien I and Immobilien II in private placements in the German markets.

50.    Additionally, Sachsenfonds, through a related company, and TAL, agreed to set up a joint venture company by the name of TSF Advisers Mauritius Limited to provide asset management and property management services to Sachsenfonds funds Immobilien I and Immobilien II.  Sachsenfonds continued to be the investment manager and adviser to Immobilien I and Immobilien II.  TSF Advisers Mauritius Limited outsourced some of its asset management and property management tasks to TAL.

51.    As part of the partnership with TAL and through Immobilien I and II, and the portfolio management agreements in place with the Mauritius company, Sachsenfonds invested in nine project companies in India.

52.     Sachsenfonds specifically invested in ventures that were already owned by TTC as they wanted pre-invested portfolios to be packaged and placed in the German private placement markets.  Hence, TTC in most cases sold a minority share in its Mauritian holding companies to Sachsenfonds as portfolios.  This, therefore, made QVT and Carrousel indirect co-investors with Sachsenfonds.

53.     Ultimately, the total size of Sachsenfond's investments with TAL reached approximately 106 million GBP, which at the time equated to approximately 200 million USD.

**Chugh's False Claims that He Had Interested Investors**

54.     On numerous occasions between 2006 and 2008, Chugh represented to Kalra and to others and that he had investors interested in investing in development and infrastructure projects in India.  He assured Kalra that he had met such investors during his stint at Lehman Brothers, and that he would be able to have these investors invest in TAL's fund companies, like TTC, and that he would work equally with Kalra and create half the value in the business.  Based on Chugh's representations, Kalra not only agreed that Chugh should own 50% of the business but also that Chugh's primary responsibilities at TAL would be fundraising and investor relations.

55.     However, Chugh never brought any investors to invest in TAL's funds, let alone any investors he claimed he had met during his prior work at Lehman Brothers. None of the investors who contributed to the TAL/TTC public offering were the result of Chugh's work.  In fact, very little of TAL's success was the result of Chugh's work as no new funds were raised after TTC and Chugh did not bring new investors to TAL's funds.

Chugh continued to represent that he would imminently be able to procure investors that had invested with Lehman Brothers for TAL's funds.

56.     Chugh's initial and ongoing representations to Kalra and to others that Chugh had investors interested in investing in development and infrastructure projects in India were false and fraudulent, and made with the intent to mislead Kalra into allocating one-half of the ownership of the business to Chugh and to retain that one-half ownership.

### Chugh's Support of QVT Against TAL

57.     As set forth above, QVT was a significant investor in TTC that increased its share of investment in TTC over time.

58.     Carrousel is a hedge fund based in London that also invested in TTC after QVT had made its initial investment.  QVT and Carrousel shared common interests in their investment in TTC in that they both had a short-term investment perspective.

59.     Beginning in early 2008, QVT began to express concerns about TTC's investments in India and its desire to liquidate those investments.  This was the beginning of what would become QVT's hostile takeover of TTC's board and later disparagement of TAL.

60.     At the end of March and beginning of April 2008, QVT, through Ron Avni, a portfolio manager for QVT, communicated to Chugh that QVT was dissatisfied with the terms of the Portfolio Management Agreement and wanted the terms to be re-negotiated.  In 2008, QVT demanded that TTC sell and liquidate all of its investments over the very short term in India and return the cash proceeds to TTC's shareholders.  A large-scale forced sale such as that requested by QVT would have required TTC to violate Indian laws on direct foreign investment and would have forced it to breach its

agreements with its other investment partners to maintain and realize on the investments over the long-term.

61.     Despite QVT's clear expression of intent in the Fall of 2008, coinciding in September 2008 with the bankruptcy of Lehman Brothers and worldwide financial recession, to take over and control the board of directors of TTC, dispose of the PMA between TTC and TAL and liquidate TTC's assets, Chugh engaged in a series of unilateral meetings and telephone conferences with executives and managers of QVT, including Mr. Avni and Daniel Gold, Managing Partner and Chief Executive Officer of QVT.  Chugh insisted that TAL's relationship with QVT be run exclusively by him.

62.     At the time of these meetings, Chugh repeatedly represented to Kalra that QVT had good intentions.  Kalra distrusted the hedge fund investors such as QVT, given QVT's track record of taking over the boards of many other companies and then asset-stripping or liquidating them for immediate cash return.  Kalra attempted to put in place defenses against hedge fund investors such as QVT and to interest other stable investors to buy-out and replace the hedge fund investors.  However, Chugh continuously thwarted these attempts.

63.     On information and belief, and for the reasons stated above, in 2008, Chugh sought and received from QVT a promise that if Chugh assisted QVT in liquidating the assets of TTC and terminating the PMA between TTC and TAL at low cost to TTC, then QVT would direct other investments to new companies, not associated with TAL or TTC, that would instead be owned and operated by Chugh.  The reasons supporting this belief include the following: (1) a senior executive of QVT, Ron Avni, stated on February 19, 2009 that all QVT needed to do to accomplish the takeover "was to [incentivize]  a

couple of parties"; (2) Chugh met numerous times privately with executives of QVT but refused and continues to refuse to disclose his notes and emails about what was said and agreed to at these meetings, despite numerous requests by TAL's counsel, namely, the SJ Berwin law firm of London and later Mr. A.K. Singh, and Mr. Abhay Singh of New Delhi, Kalra family's counsel; (3) during and subsequent to these meetings, Chugh falsely represented to Kalra that QVT did not intend to take over the board of TTC and liquidate TTC's holdings; (4) during and subsequent to these meetings, when QVT had expressly stated that it wanted to renegotiate and possible cancel the PMA, Chugh refused to allow TAL to hire litigation counsel and obtain advice for a likely upcoming defense of TAL against QVT's expected actions; (5) subsequent to these meetings, Chugh sought to block any action by TAL to prevent a takeover, even though Kalra repeatedly warned that a takeover and liquidation was what QVT intended; (6) subsequent to these meetings, after QVT had taken over TTC and TTC commenced litigation against TAL, Chugh attempted to thwart efforts by TAL to assert counterclaims and otherwise defend itself; (7) subsequent to these meetings and the commencement of litigation, Chugh, as set forth below, sought negative settlements whereby TAL would pay to settle QVT-directed TTC claims instead of TAL being paid to settle with TTC; (8) not long after the meetings in August and September 2009 and prior to TAL's notice of termination in March 2010, Chugh established the Peak XV Entities as investment advisors that competed directly with TAL.  Part of a public announcement by a partner of Peak XV states that "Peak XV [is] an investment manager firm focused primarily on India-related investments...."

64.     For these same reasons, on information and belief, Chugh may also have been promised and also received an actual financial payment from QVT to incentivize him to act in the interest of QVT and against the interest of TAL.

65.     Kalra, realizing that QVT was seeking to liquidate TTC, wanted an opportunity for TTC to buy-out QVT and replace it with other more stable investors.  He discussed with Chugh trying to negotiate an agreement with QVT whereby QVT, for a price, would (1) agree to a stand-still period during which QVT would not take any adverse actions, such as to attempt a takeover of TTC, and (2) TAL and/or TTC would have an option to buy-out the shares of QVT in TTC at a pre-determined price.  A draft copy of this option agreement, called the Block Trade Option Deed.

66.     Chugh, in late September 2008, after representing to Kalra that he was in the process of negotiating such an option agreement with QVT, presented to Kalra a vastly different deal that he said was as an already agreed-to arrangement.  Under this arrangement, which became what was called the Deed of Exclusivity TAL paid 2 million GBP, that is, 3.75 million USD, to QVT and received essentially nothing back in return.  Under the Deed of Exclusivity, instead of QVT being barred from a takeover or TAL having an option to buy QVT's shares, QVT was only prohibited during a two-month period from selling or encumbering its shares, but thereafter would be free to do so.

67.     Chugh signed the Deed of Exclusivity.  Kalra, under duress and protest, agreed to it in part because Chugh was head of investor relations at TAL and because Chugh had also vetoed requiring anything more forceful from QVT.  Chugh had barred Kalra and TAL from any other option.  Also, Chugh almost universally vetoed any contact between Kalra and QVT, saying any such contact would destroy Chugh's

relationship with QVT.  Chugh finally did allow Kalra a brief meeting with QVT

representative Daniel Gold, but the meeting was only to take place and only did take

place after Chugh and QVT had confirmed an agreement to enter into the Deed of

Exclusivity.  Kalra warned Chugh that TAL should expect continuously escalating

demands and extortions from QVT and stated that "once a blackmailer, always a

blackmailer."

68.    Kalra told Chugh that TAL should hire litigation counsel to provide advice

on how to best protect TAL against QVT's actions.  However, Chugh refused to agree to

hire counsel and vetoed TAL's attempts to do so.

69.    QVT then breached the Deed of Exclusivity by commencing adverse actions

against TTC and TAL.  At Kalra's request, TAL's counsel at the law firm of SJ Berwin

in London drafted a letter detailing QVT's breaches and requiring a return of TAL's

payment of 2 million GBP for the Deed of Exclusivity and setting aside the right to claim

future damages.  Chugh objected vociferously and refused to allow SJ Berwin to send

this letter, stating that he would not allow TAL to take action against investors despite

their breaches.  Only after inordinate delay after the breaches and after Kalra threatened

to have counsel send the letter and sue Chugh did Chugh finally agree to sign and send

the letter to QVT.   QVT did not return TAL's 2 million GBP payment.

70.    Chugh, through his 50% control of TAL, blocked multiple efforts of Kalra to

have TAL demand and prosecute its rights to a refund of the 2 million GBP exclusivity

fee.  Chugh told Kalra that Kalra did not understand investors and would not allow Kalra

or TAL to hire legal counsel to pursue TAL's claims, either before the execution of the

Deed or after its breach.  Chugh went so far as to suggest to QVT that TAL would not

pursue the breach and would forego a refund of the fee.  In response, Kalra told Chugh

that if Chugh would not permit TAL to seek to recover the 2 million GBP exclusivity fee,

then he (Chugh) should refund one-half of that fee back to Kalra.  When Chugh

repeatedly refused to do so, it became clear to the other TAL shareholders that Chugh

was working for QVT's best interests and against the best interests of TAL.

### Chugh Refuses Multiple Offers of a Division of TAL's Assets

71.     By the end of 2008, it was apparent to Kalra that Chugh had different goals

for TAL and that Chugh had not contributed to TAL anywhere near his 50% share of the

business.  Kalra had been working since 2006 to build TAL and its related entities.  Kalra

had invested not only countless hours, but also personal assets to the success of TAL.

While Kalra focused his energies on building the company, Chugh failed to contribute to

TAL at all.  In fact, for almost an entire year, Chugh refused to travel to India at all to

meet with representatives of the operating companies that TAL had established in India.

Moreover, although Chugh was TAL's board member on TTC and responsible for

investor relations, he left Kalra to take the lead in communicating with the board of TTC

and in attending most board meetings as well as investor meetings.  Instead, Chugh spent

much of his time on petty expense issues such as whether employees should be allowed

to have laptop computers or should be confined only to having desktop computers.

72.     Kalra, at the end of 2008, recognizing that the division of authority and

ownership between him and Chugh did not correlate to the work performed and the value

created, began discussing a possible severance and division with Chugh of all of TAL's

assets and interests.  In late 2008, Kalra, Chugh, and Mahesh Gandhi, Director and CEO

of TCK Advisors Ltd. ("TCK"), who essentially acted as head of TAL's operations in

India (Mumbai), met together in India.  At that meeting Kalra and Chugh agreed to the general contours of a division of the assets, which included a shut-down of TAL's London and New York offices, since these were not generating revenues for TAL, with the remaining issues to be decided in a meeting a few months later in early 2009 in the United States.  At the later meeting in the United States, Chugh reneged on his earlier agreement to a division of TAL's assets.

73.     As of April 2009, Kalra proposed a settlement and offered Chugh 50% of the interests and assets owned by TAL.  As part of this proposed division of the assets of TAL, Chugh was to receive sole ownership of a TAL-founded Mauritian company called TIREP Mauritius ("TIREP").  TIREP was to be a new fund company for TAL.  TIREP owned a database of potential investors in Indian real estate and infrastructure development, which TAL instituted and paid for at great cost (hereinafter known as the "TIREP database").  The division of assets providing for TIREP and the TIREP database to go to Chugh also included use of TAL's leased offices in London and New York, but which leases were to be paid for by Chugh solely and not by TAL.   On April 20, 2009, Kalra wrote Chugh a detailed email which starts with the phrase "[h]ere is a summary of our agreement" and then memorializes their agreements to date concerning the division of TAL, the use of existing offices in London, the wind up of the New York office, the sale and control of Panthera, the future use of the Trikona brand in India, and use of the TIREP database among other specifics.  Chugh never seriously responded to the April 20, 2009 correspondence and settlement went nowhere.

74.     Chugh's lack of response was merely a delay tactic that he employed in order to have TAL continue to pay the lease and salaries for the New York and London offices

for another six months time.  This failed agreement is merely an early example of what would become a pattern of expressions of interest in resolution that never amounted to anything on Chugh's behalf.  By these stratagems, Chugh sought to maintain a flow of TAL assets to him for his personal benefit and to block TAL from moving forward with any business initiatives.

75.     Despite the fact that Chugh backed out of the settlement, he still took ownership of the TIREP database and continued to operate the London and New York offices at TAL's expense for many months.  The eventual cost to TAL to create the TIREP database and to fund Chugh's fruitless efforts with TIREP to generate new investors was in excess of 10 million USD.  Chugh continued to operate the London offices, incurring over 5 million USD in costs through unilateral decisions which solely benefited Chugh and his interests.  Because of this, Kalra requested on numerous occasions that Chugh either close the London office or that Chugh move the London office expense onto his own personal expense accounts.  Chugh ignored Kalra's requests concerning the London office and continued to run the London office and other ventures for his own personal and sole benefit with TAL's assets.

76.     On information and belief, Chugh apparently believed that the initial success of TAL and TTC was due to his efforts, and he wanted to own 100% of some investment company managing investments in India rather than be limited to his 50% share of TAL.  Chugh also wanted to block TAL's and TTC's efforts to be successful and to compete with any companies he might establish, all while remaining as a co-Managing Director of TAL.

77.     Kalra tried again to formulate a division of TAL's assets by working further with Mahesh Gandhi on a plan whereby either Kalra or Chugh would buy out the other in what is known as a buy/sell.  In response to this further effort, Chugh in June 2009 said he would agree to some settlement when he returned from a hiking vacation to the base camp of Mount Everest, previously known in India as Peak XV.  On Chugh's return, he said he would not buy-out Kalra's share of the business per the buy/sell, but neither could Kalra buy-out Chugh's share.

78.     Kalra made still more attempts at a division with Chugh of TAL's assets.  In July 2009, he worked with Mahesh Gandhi in Mumbai to formulate another plan, set forth in an email from Gandhi to Chugh, dated July 2, 2009.  Chugh had previously committed in writing to agree to whatever plan Gandhi recommended.  Gandhi recommended a plan for a division of the assets reflecting the principle of equitable distribution.  Since Gandhi concluded that Kalra had contributed at least 75% of the value of the business, an equitable distribution required that Kalra become sole chief executive of TAL, that is, CEO, and also receive 75% of the financial benefits and distributions from TAL with Chugh to retain his TAL board seat.  Chugh, in spite of his prior commitment to agree to whatever Gandhi proposed, refused Gandhi's proposal.

79.     By July or August 2009, Chugh changed the name of TAL's London and New York offices to Peak XV, without yet incorporating any of the Peak XV Entities. He operated the New York and London offices for his own benefit, without any revenues generated by these offices being paid to TAL, and as a business competing directly with TAL.  Chugh also used the TIREP database as part of his marketing effort to generate customers for Peak XV in London and New York.

80.     When Chugh did not want to oppose TTC's purported termination of TAL's PMA in December 2009, Kalra offered still another settlement whereby Kalra would take over all the liabilities of TAL and also be appointed sole manager of TAL.  Instead, Chugh did not agree to Kalra's plan to take over the liabilities and responsibilities but he also continued to veto any action permitting TAL to fight back or to protect itself in any way.

81.     On January 20, 2010, Kalra emailed Chugh proposing that they engage an outside firm specializing in partnership disputes to help them resolve their differences. Later, the Collegium of Advisers ("COA"), described below, upon request of TAL chairman Saurabh Killa, agreed with the idea of appointing an outside firm for this purpose and did in fact engage a firm to perform this work.  Chugh never accepted this idea and rejected any role for the outside firm and as always threatened to sue the COA and TAL directors and would not allow them to implement it.

82.     On January 22, 2010, Kalra again proposed a settlement and division of TAL's assets between himself and Chugh, which Kalra and Chugh sometimes referred to as a general partner or GP settlement.  Chugh, in an email dated January 22, 2010, agreed saying, in part: "We should agree to have a GP settlement on all issues during the next few weeks …."  However, and again, despite Chugh's nominal agreement to enter into a settlement, he did not do so.  At a May 2010 mediation between TAL and TTC, Chugh requested that TAL employees, Krishen Dhar and Pravin Rathod, and TAL counsel A.K. Singh, come to the mediation and assist in a parallel mediation between him and Kalra. At this parallel mediation, which took place the night before the official mediation, Chugh agreed to a sixty-forty split in favor of Kalra of the economic benefits of TAL.

However, the day after the official mediation, Chugh said he would not sign an agreement reflecting a sixty-forty split of TAL's economic interests in Kalra's favor, saying it was a new day and a new deal.  Subsequently, Krishen Dhar, Pravin Rathod, and TAL counsel A.K. Singh, who were present when Chugh reneged on his earlier agreement, said it was worthless speaking to Chugh about settlement and that he was not a man to be trusted.

83.     As set forth in detail later, in June 2010, a Collegium of Advisors ("COA") was set up in part to broker a division of TAL's assets between Kalra and Chugh.  Kalra and Chugh, in a document entitled Memorandum of Understanding ("MOU"), at paragraph f), dated June 16, 2010, agreed that the COA could assign 20% of the "economic benefits" of TAL "to either AK [Kalra] or RC [Chugh] in any proportion that COA may deem fit."  On June 22, 2010, the COA passed a resolution stating, at paragraph no. 2, that the discretionary economic benefit it was authorized to decide under the MOU was assigned to Kalra.  Chugh refused to accept and permit the payment of the COA's allocation of the additional 20% of the economic benefits to Kalra.  Chugh also threatened to sue the members of the COA and tried to dissolve it.

## Chugh Appropriates TAL's Assets and Business Opportunities

84.     On October 7, 2009, Chugh incorporated his own investment adviser company called Peak XV Capital Advisers, LLC ("Peak XV Capital").  Peak XV Capital continued Chugh's appropriation TAL's employees, furniture, equipment, investors, and TIREP database, and for many months siphoned funds from TAL to pay for the operating expenses of Peak XV Capital.  Moreover, since Peak XV Capital also provided investment products, primarily in India, it became a direct competitor to TAL.

TAL was not terminated as adviser to TTC until March 16, 2010, long after Peak XV Capital was incorporated. Chugh used TAL's assets, funds, furniture, equipment, employees, and investor database to build Peak XV Capital.

85. Chugh took control of the TIREP fund database, without authorization, when it was the property of TAL. Utilization of this database was a theft of TAL's trade secret and intellectual property. For an investor adviser such as TAL, one of its major assets is its database containing the names of its prospective investors. Chugh admitted that the TIREP database, contained in a software program known as "SalesForce," among other places, was the property of TAL. Pravin Rathod, when he became a member of the COA, recorded in COA Minutes that "during their discussion in London, it had been agreed by RC [Chugh] to pass on all the contact details in the Sales Force on TIREP to AK [Kalra] as well, it being the property of TAL."

86. Kalra and other TAL employees, including Mahesh Gandhi and Pravin Rathod, on multiple occasions asked Chugh for this database, but Chugh never provided a full copy. Finally, after many demands, Chugh did eventually provide a partial copy of the TIREP database, but only after he had spent considerable time and effort redacting and/or removing a substantial number of the names of the potential investors in the database.

## Chugh Thwarts TAL's Defense of Litigations

87. In 2009, QVT and Carrousel accelerated their efforts to take over TTC and to terminate TAL's PMA with TTC. By the summer of 2009, QVT and Carrousel, through a series of TTC board meetings QVT and Carrousel called on an emergency basis, placed enough of their own controlled directors on the TTC board to command a majority of the

board.  Finally, on July 13, 2009, QVT and Carrousel, through another board meeting, without any advance notice or warning, orchestrated the removal of the remaining TTC board members, including Michael Cassidy, whom they did not control.

88.     On December 9, 2009, TTC (now controlled by QVT and Carrousel) wrote to TAL claiming breaches of the PMA and purporting to terminate the PMA.  QVT and Carrousel, acting through their appointees to the TTC board, then sought to renegotiate the terms of the PMA in their favor.  They sent a Carrousel employee to India for the purpose of spreading malicious rumors about TAL in order to discredit TAL.  QVT and Carrousel also sought to enlist Sachsenfonds to file a claim against TAL.

89.     On February 10, 2010, TTC and TCML filed a claim for arbitration against TAL with the London Court of International Arbitration ("LCIA") seeking termination of the PMA.  TAL answered by denying any material breaches and the claimed right of TTC and TCML to terminate the PMA.  TAL also responded with a counterclaim stating that termination of TAL was without merit and was for the purpose of enriching non-parties QVT and Carrousel.

90.     Chugh was aware of the intentions of QVT and Carrousel to destroy TAL's reputation and dismantle TTC for QVT and Carrousel's own gain.  Despite this knowledge, Chugh continually thwarted TAL's defense of TTC's claims and attempted to persuade TAL not to file countersuit against TTC for QVT and Carrousel's attempts to destroy TAL.  Chugh would not even agree to allow TAL to hire counsel or seek any litigation advice.

91.     While the TTC litigation wore on, QVT and Carrousel eventually persuaded

Sachsenfonds to file its own frivolous lawsuit against TAL in an attempt to overwhelm and destroy the company. The Sachsenfonds litigation was merely a recitation of the same claims that were present in the TTC litigation. To date, Chugh has attempted not only to thwart TAL's efforts to defend the Sachsenfonds litigation, but also to withhold payment to TAL's counsel, and even to terminate the services of TAL's counsel.

92. Upon information and belief, Chugh was aware of the intentions of QVT and Carrousel all along and did nothing to protect TAL from the TTC or the Sachsenfonds litigations.

93. As the TTC and Sachsenfonds litigations wore on, Chugh continued his pattern of delay tactics, frustrating settlements, and utilizing TAL's assets and services for his sole benefit, to the detriment of TAL.

**Chugh Blocks a Failsafe Merger of TAL with IIML**

94. In 2008 and 2009, IL&FS Investment Managers Limited ("IIML"), one of India's leading financial services companies providing investment advisory services and selling investments mostly to Indian institutional and retail investors, sought a merger with TAL. IIML is a subsidiary of IL&FS, a named shortened from Infrastructure Leasing & Financial Services Limited, one of the oldest and largest private equity fund managers in India, and which is listed in India on both the National Stock Exchange and Bombay Stock Exchange, by far the two largest stock exchanges in India. IL&FS had partnership arrangements on many projects with several State Governments in India and with the Central Government.

95. IIML was very familiar with TAL since, as mentioned above, in 2006, IIML's parent company, namely, IL&FS, and IIML, had engaged in several successful

real estate and infrastructure investment and development partnership arrangements with TAL.

96.     In 2009, IIML became interested in merging with TTC and TAL.  IIML became interested in TTC and TAL because it was looking to acquire a fund company trading on the London or European stock markets with access to western investors. Given the high value of TTC and TAL at that time, Kalra and Chugh both stood to acquire a substantial equity share in IIML and to escape the asset-stripping risk posed by QVT and Carrousel.  Chugh vetoed a merger between IIML and TAL.  Specifically, Chugh told Mahesh Gandhi that he forbade Gandhi to speak to IIML about IIML's merger proposal.  On November 18, 2010, IIML, rebuffed by Chugh's refusal to respond to IIML's interest, bought or merged with Saffron Asset Advisors Private Ltd ("Saffron").  Saffron was the fund manager for Yatra Capital, a fund listed on the pan-European Euronext stock exchange and with assets invested of less than TTC of about 305 million USD.   Subsequent to acquiring Saffron, IIML's total assets under management increased to 3.2 billion USD.

**Chugh Frustrates Ability of Intermediary to Manage Litigations**

97.     Kalra, in a final effort to circumvent Chugh's efforts to veto TAL's defense of the litigations, arranged the establishment of an intermediary group called the Collegium of Advisors ("COA") to act as impartial intermediaries in managing TAL's defense of the litigations, among other things.  On June 16, 2010, Kalra and Chugh executed a Memorandum of Understanding (hereinafter "MOU"), which established the COA.  The MOU stated that the COA "will be the final decision maker on any and all matters after consultation with AK [Kalra] and RC [Chugh] where required.  None of the

shareholders shall have the veto power on the litigation." The main purpose of the COA was to offer TAL some way to defend itself in the ongoing litigations since Chugh had been actively vetoing TAL from paying litigation counsel and blocking and disrupting TAL's defenses of these actions.

98.      The COA was comprised of key employees of TAL-related corporations in India, specifically: Mahesh Gandhi, ex-CEO of Jardine Fleming's asset management and unit trust operations in India and CEO of the Unit Trust of India; Pravin Rathod, a chartered accountant and lawyer, with twenty years of experience in audit, tax, financial consulting and investment banking; Krishen Dhar, with 40 years of project management and business development experience at ICI India and other companies; and Dr. P.S. Rana, former Chairman of the Housing & Urban Development Corp. and with 35 years of experience in real estate and infrastructure finance and development. The COA was created to be an impartial forum to oversee the ongoing disputes between Kalra and Chugh and to assist TAL in executing effective litigation strategies that were in the best interests of the company. The COA conducted its meetings and operations in Mumbai and New Delhi, India.

99.      Chugh, as noted in the July 2, 2010 Minutes of the COA, tried to prevent the formation of the COA and then requested that the MOU be declared null and void.   In its Minutes, at ¶2, "the COA concluded that the MOU executed by both shareholders of TAL is a valid document and [the] COA is properly constituted." Chugh continuously tried to force the resignations of Krishen Dhar and Dr. P. S. Rana from the COA as well as to force the resignations of senior directors in India. Chugh also tried to block the COA from performing its duties by preventing its funding. See email of P.S. Rana to

Chugh, and others, describing Chugh's actions as a "material breach" of the MOU, dated November 26, 2010.

100.    Chugh also continued his pattern of reneging on agreements in frustration of TAL's best interests.  He threatened suit against two independent directors of TAL, namely, Ravindra Chitnis and Saurabh Killa, unless they did what Chugh demanded and when they refused, he challenged the validity of TAL's board of directors' actions in appointing them and then tried to force their resignations.  The validity of the appointments was only concluded when an opinion of TAL's corporate counsel, established that a previous resolution of the board of TAL, signed by Chugh himself, permitted the appointments and that notice of the board meeting where the appointments were made was duly provided to Chugh.  Chugh then demanded that all decisions of the TAL board be unanimous, so that he would have a blocking veto, although a requirement of board unanimity is a recognized impediment to effective corporate governance.

### Chugh Helps Force TAL Into Adverse Settlement of TTC Litigation

101.    Chugh, despite full knowledge of QVT's adversarial position towards TAL, engaged in numerous private discussions and meetings with representatives of QVT throughout 2009.

102.    Subsequent to Chugh's meeting with representatives of QVT, Chugh refused to allow TAL to take any action against the efforts of QVT and Carrousel to take over the Board of TTC and to liquidate the assets of TTC.  Instead, in an organization managing hundreds of millions in development projects in India, Chugh continued to limit his participation to micromanaging petty expense issues.

103.    Chugh refused to cooperate and assist in defense of the TTC litigation, which was controlled by directors of TTC acting in the interest of QVT.  In general, Chugh refused to respond to requests that required his authority as a director of TAL and he would delay responding to litigation-related events with important deadlines. Specifically, he continued refusing to provide to TAL's attorneys, even after numerous requests, his notes from and emails about private meetings he had with QVT and Carrousel.  Chugh delayed the drafting and execution of an affidavit that was essential to complete required discovery, and eventually refused to provide the affidavit altogether. Kalra was forced to provide almost all of the litigation support, such as affidavits, for TAL.  Chugh attempted to thwart TAL's exercise of its right to appoint one of the arbitrators for the arbitration panel, which could have resulted in the arbitration panel convening with TTC's appointed arbitrator but without TAL's.  Chugh would not release funds that had he had earlier approved in the MOU for the purposes of funding the litigation, unless his demands concerning issues on the TAL Board, completely unrelated to the functioning of the COA, were met.

104.    Chugh continuously requested that directors in India, as well as TAL directors, resign if they did not agree with his demands.  When those directors, such as TAL directors Ravindra Chitnis and Saurabh Killa, would not resign, he threatened to sue them.  Chugh's acts and threats against TAL's directors were ongoing while TAL was busy defending major lawsuits against it.  Rather than defend the best interests of TAL, Chugh sought to thwart TAL's ability to function.

105.    As Chugh resisted every attempt Kalra made to ensure that TAL could defend itself against litigation, Kalra offered to take full liability, which would allow

Chugh to walk away without any liability, and to single-handedly defend TAL's interests. Chugh refused to agree.

106.    Instead, Chugh sought to force TAL into a settlement with TTC whereby TAL would "surrender" to TTC, presumably by paying TTC, or by attempting at best to "walk away" and receive no payment form TTC.  Chugh's statements that he wanted a walk-away or even a "surrender" settlement are set forth in an email of Krishen Dhar to Mahesh Gandhi, Chugh, and others, dated November 16, 2010.  Chugh refused to provide any reason why TAL should enter into a "surrender" settlement with TTC.

107.    In December 2010, counsel for Kalra and Asia Pacific several times put Chugh on notice of his multiple breaches of the fiduciary duty he owed to TAL, including, among others: his refusal to disclose his relationship with QVT; the false information he provided leading to TAL's 2 million GBP payment to QVT; his actions damaging the litigation position of TAL in TTC's QVT-orchestrated attempt to terminate the PMA; and his efforts to stifle the board of TAL and prevent TAL from defending itself. See Letters of Abhay Singh & Associates – Advocates, dated December 10 and 15, 2010.

108.    Chugh eventually forced TAL into an unfavorable settlement with TCC.  Due in part to Chugh's action, instead of TAL settling with TTC for the actual value of TAL's rights under the TTC of almost 200 million USD, TAL ended up settling essentially for payment by TTC of 7.5 million GBP, that is, 14.0 million USD, as set forth in the Arbitration Settlement Agreement.  TAL's eventual settlement with TTC for 7.5 million GBP resulted in a loss to TAL of almost 200 million USD.

109.    In what would be viewed by the Board as the ultimate act of betrayal, Chugh jeopardized the Arbitration Settlement Agreement between TTC and TAL by refusing in the final minutes to sign the agreed settlement documents, after Kalra had already signed, until TTC threatened a claim for breach of the settlement agreement and penalties.  See email of Pravin Rathod to Chugh, and others, dated February 17, 2011.  Chugh's actions could have resulted in an adverse order against TAL by the arbitration tribunal.

110.    Chugh employed the same delay tactics in the Sachsenfonds litigation as he employed concerning the TTC/QVT litigation.  Pravin Rathod, the CFO of TAL's India operations and a Director of TCK, wrote to Chugh directly on May 6, 2010 requesting approval and decisions concerning the Sachsenfonds litigation, specifically requesting that Chugh sign off on the release of funds to pay TAL's attorneys to defend the litigation.  Chugh again delayed and ignored requests specific to the Sachsenfonds litigation as he had with respect to the TTC/QVT litigation.

### Chugh Continues Efforts to Thwart TAL and the COA

111.    Chugh consistently took actions that would disrupt TAL's day-to-day operations.  He refused to release funds in order to pay the salaries of TAL employees based in India.  Chugh also repeatedly requested that members of the TAL Board of Directors resign, especially in instances where those members expressed disagreement with him, denied a request by him or pressured him to follow through with his obligations to TAL.

112.    Chugh would ignore and delay action on requests by heads of the TAL India

operations in an effort to frustrate the day-to-day business operations of any of the TAL Indian entities.  Chugh continued his behavior of agreeing to a number of issues and then responding in the opposite later in efforts to frustrate the business operations of TAL.

113.    Chugh repeatedly impeded the COA from performing its duties, including refusing to release funds that he had agreed upon to enable the COA to function and refusing to release funds needed to pay attorneys representing TAL in the litigations.

114.    Chugh repeatedly threatened to sue members of the COA and directors of TAL-related companies in India if they spent any money on lawyers to defend TAL and the TAL-related companies.

### Chugh Blocks TAL's Liquidation of its Shares in TTC

115.    TAL held about 4% of the shares of TTC.  By June 2011, at the request of TAL's auditors, Kalra and Chugh had agreed to a complete distribution of these shares with 50% to Asia Pacific (Kalra family) and 50% to the Chugh Entities (Chugh family). At that time, TAL's total shares in TTC were worth about 1.6 million GBP, that is, about 2.6 million USD, and thus the individual 50% interest of Kalra and Chugh was then worth about 1.3 million USD.  Chugh, despite his prior agreement and in spite of the advice of TAL's auditors to make the distribution, refused to agree to any distribution of TAL's shares in TTC, including his own 50%, and thereby also prevented Kalra from receiving his 50% interest.  Chugh would not provide any explanation as to why he was reneging on the agreement.  Chugh was informed many times of the potential and real loss he was causing to TAL and Kalra, and yet he failed to respond.

116.    At present, the price of TTC's shares has fallen to one-half of the value they had in June 2011 resulting in a fall in the value of Asia Pacific's shares from 1.3 million USD to about 650,000 USD, that is, a loss of 650,000 USD.

### Chugh's Further Refusal in Late 2011 of a Negotiated Resolution

117.    Starting again in August 2011, Kalra again attempted a negotiated resolution of at least some of the outstanding disputes between himself and Chugh.  Specifically, Kalra attempted to obtain from Chugh negotiated agreements resolving the following issues: (1) disposition of all remaining TAL group operating companies by a mutual bidding process, including the company known as Sankalp, including whether new directors would be appointed for this company; and (2) what mechanism, ultimately controlled by Kalra and Chugh, was to manage the ongoing litigation with Sachsenfonds and the dispute with the insurance companies.  Kalra wanted Chugh to agree to do one-half of the work in managing the ongoing litigation, since Chugh had not done so in the past, if Chugh was to receive one-half of the proceeds from any settlement obtained.

118.    On the issue of the disposition of Sankalp, Kalra urged, in order to avoid a dispute over the valuation of Sankalp, that Kalra and Chugh engage in a bidding process for ownership of Sankalp.  Chugh, by email dated September 16, 2011, agreed in principle to a process for disposing of Sankalp, proposed by Kalra, whereby Kalra and Chugh would each make bids for the ownership of Sankalp, with the highest bidder winning the right of ownership and paying the bid proceeds to the low bidder.  Sankalp, a project developed by Kalra in which Chugh had no participation, was a very valuable asset because it was a development company with contracts to construct "bespoke" housing for management and employees near the sites of new office buildings and

industrial locations in India.  There was virtually unlimited demand for such "bespoke" housing in India, and Sankalp had a vast head-start over potential competitors.  Besides its existing contracts to build such housing, Sankalp could quickly have lined up another 10-12 such projects, allowing it to earn profits in excess of 50 million USD.  Chugh did not help to build Sankalp and in the past, had tried to shut it down and take out the cash.

119.    Chugh agreed to a deadline to implement the proposed bidding process for Sankalp, first of October 15, 2011, which deadline Kalra then extended to October 30th and then finally, by email dated October 26, 2011, to November 7th.  However, Chugh did not engage in any bidding process at any time and has since then not suggested a new date for the bidding nor proposed any other settlement for the disposition of Sankalp. Chugh, by his actions and through habitual delay tactics, has reneged on his agreement to divide the Sankalp asset through a bidding process with Kalra.

120.    On whether new directors would be appointed for Sankalp, to assist in the disposition process, Chugh, by email dated October 7, 2011, agreed to this in principle. However, Chugh, by another email also dated October 7, 2011, but later in the day, began to qualify his agreement with conditions and limitations, which resulted in no new directors being appointed to aid in the asset disposition.

121.    Kalra, concerned about TAL's ability to protect its assets, repeatedly asked Chugh to allow TAL to put TAL directors on the board of Sankalp.  Chugh, after months of delay and vetoes, finally agreed and signed a TAL board resolution to that effect. Recently, TAL's controller informed Kalra that despite signing the TAL board resolution, Chugh contacted him personally and instructed the controller to put on hold the issue of placing TAL directors on the board of Sankalp.  In addition, Chugh directed the

controller not to disclose his instructions to any board member of TAL, especially Kalra. Chugh has also engaged in the unilateral action of firing Sankalp's employees to prevent Sankalp from performing its contracts and being a viable going concern of high value to TAL, thus making the agreed-upon bid process between him and Kalra redundant.  On information and belief, Chugh did all of this to thwart TAL from being a viable business and to prevent it from competing with Chugh's new companies, the Peak XV Entities.

122.    Recently, Kalra was informed by TAL's controller that funds have been taken out of Sankalp's accounts without TAL's approval and that the controller is investigating the issue.

### Summary of TAL's Injuries

123.    As a result of the foregoing, TAL and Asia Pacific have suffered the following injuries and  losses:

(1)    TAL and Asia Pacific, due to Chugh's intentional, material and repeated breaches of his fiduciary duty owed to TAL, seek absolute forfeiture of any and all compensation, profit or property owed or to be owed by TAL to him, or any of the Chugh Entities, including, without limitation, any and all right, title and interest that the Chugh Entities have in the shares, however held, of TAL, such that all such compensation, profit, and shares be forfeited absolutely to Asia Pacific, and that all of the interest of Chugh in any other asset, including, without limitation the Peak Entities, ARC Capital, the RC Family Trust, and Byte Consulting, be disgorged and forfeited absolutely to Asia Pacific;

(2)    TAL and Asia Pacific lost 1.3 million USD from Chugh's refusal to permit the 2011 distribution of TAL's shares in TTC;

(3)     TAL and Asia Pacific lost 10 million USD based on the use of TAL's funds spent to create the TIREP database, appropriated by Chugh for himself and his Peak XV Entities, and to fund Chugh's fruitless efforts with TIREP, plus consequential damages for TAL's loss of use of the database in an amount to be established at trial;

(4)     TAL and Asia Pacific lost 3.75 million USD by paying under duress for the illusory Deed of Exclusivity that Chugh forced on TAL;

(5)     TAL and Asia Pacific lost up to 5million USD based on the TAL funds spent on what became the London office of the Peak XV Entities;

(6)     TAL and Asia Pacific lost 3.9 million USD based on Chugh's refusal to honor and/or permit distribution of the award by the COA to Kalra of an additional 20% share of all assets of TAL and any proceeds of litigation settlements paid or payable to TAL;

(7)     TAL and Asia Pacific lost over 200 million USD from its failure to merge with IIML.  At the time IIML offered to merge with TAL and TTC, IIML's value and assets under management were similar to those of TAL, but TAL had created huge value in the near 100% increase in the value of its assets under management.  IIML was prepared to allocate to TAL its share of an accrued performance fee under the PMA to be paid out to TAL as per the PMA, plus provide TAL with a share of the ownership of the merged company of up to 20%.  Today, the value of that performance fee alone, per TAL's claim, is 200 million USD, and the 20% of IIML would be worth at least 20 million USD;

(8)     TAL and Asia Pacific lost 210.4 million USD in profit under the PMA that it otherwise would have earned.  TAL's PMA was to run until April 21, 2016.  Over and

above what TAL earned and was paid under the PMA, it would have earned additional profit of at least 210.4 million USD. This amount would have included additional management fees of 62.8 million USD, and additional profit sharing of 147.6 million USD;

(9)     TAL and Asia Pacific lost 200 million USD due to the failure of its Indian development company, Panthera Developers Private Limited, which failure was brought about directly by Chugh. Panthera had sufficient contracts and potential projects that it could have gone public in 2010 – 2011, had Chugh not prevented Kalra from funding and building it, at a value of at least 200 million USD. At that time in India, the small development companies that went public sold for market values of 200 million USD, while several went public for 1 billion USD, and the largest one went public for 10 billion USD.

(10)     TAL and Asia Pacific lost an unknown amount based on the appropriation by the Peak XV Entities of the business opportunities of TAL.

### COUNT I
**Chugh - Breach of Fiduciary Duty to Corporation**
**Appropriation of TAL's Assets and Business Opportunities**

124.     TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

125.     As an executive officer and member of the board of TAL, Chugh owed a fiduciary duty of good faith and loyalty to TAL.

126.     Chugh's actions outlined above, particularly Chugh's misappropriation of TAL's funds, the TIREP database, the use of office space, furnishings and equipment owned by TAL, payment to former TAL employees to work for the Peak XV Entities

through TAL's accounts, to build and fund his new companies, the Peak XV Entities, none of which was in TAL's best interests, constitute a breach of the duties of good faith and loyalty he owed to TAL.

127.     As a result of the foregoing, TAL and Asia Pacific have suffered injuries to be determined at trial.

## COUNT II
### Chugh - Breach of Fiduciary Duty to Corporation
### Thwarting TAL's Litigation Defenses and Settlements

128.     TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

129.     As an executive officer and member of the board of TAL, Chugh owed a fiduciary duty of good faith and loyalty to TAL.

130.     Chugh's actions outlined above, particularly his refusal to hire litigation counsel to defend TAL versus QVT's actions, Chugh's refusal to disperse funds to pay for defense of litigations, and his interference with ongoing litigations against TAL with TTC and Sachenfonds and resolution of those litigations, constitute a breach of the duties of good faith and loyalty he owed to TAL.

131.     As a result of the foregoing, TAL and Asia Pacific have suffered injuries to be determined at trial.

## COUNT III
### Chugh - Breach of Fiduciary Duty to Corporation
### Blocking Development of New TAL Corporate Subsidiaries and Opportunities

132.     TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraph as if fully set forth herein.

133.     As an executive officer and member of the board of TAL, Chugh owed a fiduciary duty of good faith and loyalty to TAL.

134.     Chugh's actions outlined above, including but not limited to Chugh's refusal to partner with IIML blocked development of TAL corporate subsidiaries and growth opportunities constitute a breach of the duties of good faith and loyalty he owed to TAL.

135.     As a result of the foregoing, TAL and Asia Pacific have suffered injuries to be determined at trial.

### COUNT IV
**Chugh - Breach of Fiduciary Duty to Corporation
Shutting Down TAL's Corporate Subsidiaries**

136.     TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

137.     As an executive officer and member of the board of TAL, Chugh owed a fiduciary duty of good faith and loyalty to TAL.

138.     Chugh's actions outlined above, including but not limited to Chugh's refusal to sell down TTC stock and bid out the Sankalp development project as well as thwarting numerous attempts to resolve the differences with Kalra concerning the day-to-day operation of TAL constitute a breach of the duties of good faith and loyalty he owed to TAL.

139.     As a result of the foregoing, TAL and Asia Pacific have suffered injuries to be determined at trial.

### COUNT V
**Chugh - Breach of Fiduciary Duty to Corporation
Refusing Required Disclosures of Conduct in Breach of Duty**

140.    TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

141.    As an executive officer and member of the board of TAL, Chugh owed a fiduciary duty of good faith and loyalty to TAL.

142.    Chugh's actions outlined above, including but not limited to, Chugh's refusal to provide information, notes and electronic correspondence concerning his meetings and conversations with representatives of QVT and Carrousel despite numerous requests by TAL's attorneys and employees and agents of TAL, and his refusal to provide accountings of the monies spent building investor databases despite numerous requests by TAL employees, constitute a breach of the duties of good faith and loyalty he owed to TAL.

143.    As a result of the foregoing, TAL and Asia Pacific have suffered injuries to be determined at trial.

### COUNT VI
**Chugh, The Peak Entities, The Chugh Entities,
ARC Capital, RC Family Trust, and Byte Consulting
– Constructive Trust, Disgorgement and Forfeiture**

144.    TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

145.    As an executive officer and member of the board of TAL, Chugh owed a fiduciary duty of good faith and loyalty to TAL.

146.    As a result of Chugh's willful, catastrophic and chronic breaches of fiduciary the stock, assets and profits of his competing companies, and the participation of the Peak XV Entities in those braches, the assets and stock of the Peak XV Entities

should be held in constructive trust for the benefit of the Asia Pacific and TAL and then should be disgorged and/or forfeited to Asia Pacific.

147.     Also, as a result of the foregoing, Chugh's interest in the stock of TAL itself, and that of any related parties holding TAL's stock for his benefit, should be held in constructive trust, and then disgorged and/or forfeited to Asia Pacific.

148.     Also, as a result of the foregoing, the same equitable remedies should be applied to all other assets of Chugh, including, without limitation, ARC Capital, the RC Family Trust, and Byte Consulting, and that of any related parties holding such assets for his benefit, that is, that such assets should be entirely and completely disgorged and/or forfeited to Asia Pacific.

## COUNT VII
### Chugh - CUTPA

149.     TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

150.     Chugh has violated the Connecticut Unfair Trade Practice Act, C.G.S.A. § 42-110g through his unfair and deceptive acts related to his breaches of fiduciary duty and lack of good faith concerning TAL.

151.     Specifically, Chugh misappropriated TAL's assets for his own personal gain and for the benefit of his new business, Peak XV, Chugh interfered with ongoing litigation and attempted to block amicable settlement to the detriment of TAL, and he interfered with TAL's day-to-day business operations by withholding salary payments, payments to vendors and exercising veto power in an effort to derail TAL's business operations.

152.     As a direct and proximate result of Chugh's unfair trade practices, TAL

and Asia Pacific have suffered injuries to be determined at trial.

## COUNT VIII
### Chugh – Statutory Theft

153.    TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

154.    Through misappropriation of TAL's assets including monies, use of properties and proprietary data contained in an investor database, Chugh committed statutory theft against TAL and its shareholders.

155.    Chugh wrongfully stole money and other assets owned or controlled by TAL and illegally used TAL's assets for the purposes of benefiting personally and benefitting his new company Peak XV professionally.

156.    As a result of Chugh's actions in violation of C.G.S.A. § 52-564, TAL and Asia Pacific have suffered injuries to be determined at trial.

## COUNT IX
### Peak XV Entities – Unjust Enrichment

157.    TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

158.    The Peak XV Entities benefited from the wrongs of Chugh including utilization of TAL assets to pay employees engaged in work for Peak XV Entities' business, use of TAL office locations to conduct Peak XV Entities' business, and use of the TIREP database to build an investor portfolio for the benefit of the Peak XV Entities.

159.    As a result of the foregoing, TAL and Asia Pacific have suffered injuries to be determined at trial.

## COUNT X
### Peak XV Entities – Conversion

48

160.    TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

161.    The Peak XV Entities converted the assets and monies owned by TAL and utilized these assets for their own benefit.

162.    Specifically, the Peak XV Entities deprived TAL the use of its London and New York offices, TIREP investor database and countless sums of money used to fund the start up of the Peak XV Entities without authorization from TAL.

163.    As a result of the foregoing, TAL and Asia Pacific have suffered injuries to be determined at trial.

<u>COUNT XI</u>
**Peak XV Entities – Intentional Interference with
Advantageous Business Opportunities**

164.    TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

165.    The Peak XV Entities were founded and/or managed by Chugh.

166.    The Peak XV Entities were aware of Chugh's role as a director and principal of TAL.

167.    The Peak XV Entities, through the actions of Chugh and other former TAL-employees, actively interfered with TAL's advantageous business opportunities.

168.    Specifically, the Peak XV Entities withheld the TIREP investor database and information contained therein from TAL and utilized it for Peak XV's own benefit, Peak XV tortiously converted assets owned or controlled by TAL for the Peak XV Entities' benefit, namely monies paid to employees of Peak XV from TAL's accounts and the use of offices in London and New York to conduct Peak XV Entities business and working in

concert, through Chugh, with QVT to disrupt TAL's business opportunities and destroy TAL's reputation to TAL's detriment.

169.    As a result of the foregoing, TAL and Asia Pacific suffered injuries to be determined at trial.

**COUNT XII**
**CUTPA - Peak XV Entities**

170.    TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

171.    The Peak XV Entities violated the Connecticut Unfair Trade Practice Act, C.G.S.A. § 42-110g through their unfair and deceptive acts related to their theft and conversion of TAL's assets for Peak XV's own business use.

172.    Specifically, the Peak XV Entities, through their principal Chugh, misappropriated TAL's assets for Peak XV's own business gain.

173.    As a direct and proximate result of the Peak XV Entities' unfair trade practices, TAL and Asia Pacific have suffered injuries to be determined at trial.

**COUNT XIII**
**Peak XV Entities – Statutory Theft**

174.    TAL and Asia Pacific reallege and reassert each of the allegations of the above paragraphs as if fully set forth herein.

175.    Through misappropriation of TAL's assets including monies, use of properties and proprietary data contained in an investor database, the Peak XV Entities committed statutory theft against TAL and its shareholders.

176.    The Peak XV Entities, through their controlling principal Chugh, wrongfully

stole money and other assets owned or controlled by TAL and illegally used TAL's assets for the purposes of benefiting their businesses.

177.     As a result of the actions of the Peak XV Entities' in violation of C.G.S.A. § 52-564, TAL and Asia Pacific have suffered injuries to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

(1)     Award, on Count V, a temporary restraining order and, after hearing, a preliminary injunction, enjoining Rakshitt Chugh, from withholding, hiding, altering, or destroying in any manner any and all emails, notes, letters, memoranda and communications of any kind passing between him and QVT Financial, Carrousel Capital, or any other investor in any existing or planned fund company managed or to be managed by Trikona Advisors Limited (collectively, the "Hedge Funds"), concerning Trikona Advisors Limited, the Portfolio Management Agreement between Trikona Advisors Limited and Trikona Trinity Capital, and the interest, shares or ownership of any kind held by the Hedge Funds at any time in Trikona Trinity Capital, until further order of the Court;

(2)     Award, on Counts I-VI, a temporary restraining order and, after hearing, a preliminary injunction, enjoining Rakshitt Chugh, individually, and Rakshitt Chugh as Trustee of the RC Family Trust, ARC Capital, LLC, all others in active concert with Chugh, the RC Family Trust, and ARC Capital,LLC, including, without limitation, any other corporation, partnership or trust, plus all of the agents and attorneys of any of the foregoing (collectively, the "Chugh Entities"), from transferring, conveying, encumbering, pledging, or otherwise disposing of in any manner, any and all shares of

stock, held in whatever name, in Trikona Advisors Limited, until further order of the Court;

(3)     Award, on Counts I-VI, a temporary restraining order and, after hearing, a preliminary injunction, enjoining Trikona Advisors Limited, and its corporate registrars, agents and attorneys, from transferring on the books of the company the ownership of, or any other rights in, any shares now held in the name of, or for the benefit of, Rakshitt Chugh, individually, and/or Rakshitt Chugh as Trustee of the RC Family Trust, ARC Capital, LLC, and all others in active concert with Chugh, the RC Family Trust, and ARC Capital, LLC, including, without limitation, any other corporation, partnership or trust, plus all of the agents and attorneys of any of the foregoing (collectively, the "Chugh Entities"), until further order of the Court;

(4)     Award, on Counts I and VI, a temporary restraining order and, after hearing, a preliminary injunction, enjoining Rakshitt Chugh, individually, and Peak XV Capital Advisers, LLC, Peak XV Capital, LLC, Peak XV GP, LLC and Peak XV Fundamental Value, LP, and all others in active concert with the Peak Entities, plus all of the agents and attorneys of any of the foregoing (collectively, the "Peak Entities"), from continued use in any manner whatsoever and to any degree whatsoever, any database, customer or prospective customer lists, furniture, fixture, equipment, or property or asset of any kind, now or formerly owned or possessed in any manner whatsoever, by Trikona Advisors Limited, until further order of the Court;

(5)     Award, on Counts I-VI, a temporary restraining order and, after hearing, a preliminary injunction, enjoining Rakshitt Chugh, individually, and Peak XV Capital Advisers, LLC, Peak XV Capital, LLC, Peak XV GP, LLC, Peak XV Fundamental

Value, LP, Rakshitt Chugh as Trustee of the RC Family Trust, ARC Capital, LLC , and all others in active concert with Chugh, the RC Family Trust, and ARC Capital, LLC, including, without limitation, any other corporation, partnership or trust, plus all of the agents and attorneys of any of the foregoing (collectively, the "Chugh Entities"), from accessing, withdrawing, selling, encumbering, pledging or otherwise disposing of in any manner, any property, asset or funds now or formerly owned or possessed in any manner whatsoever by Trikona Advisers Limited and/or Asia Pacific Investments Ltd., until further order of the Court;

(6)     Award, on Counts I-VI, a temporary restraining order and, after hearing, a preliminary injunction, enjoining Peak XV Capital Advisers, LLC, Peak XV Capital, LLC, Peak XV GP, LLC and Peak XV Fundamental Value, LP. (collectively, the "Peak Entities"), and their agents and attorneys, from selling, paying, lending, pledging, encumbering or otherwise transferring in any manner, to Rakshitt Chugh, individually, and/or Rakshitt Chugh as Trustee of the RC Family Trust, ARC Capital, LLC, and all others in active concert with Chugh, the RC Family Trust, and ARC Capital, LLC, including, without limitation, any other corporation, partnership or trust, plus all of the agents and attorneys of any of the foregoing (collectively, the "Chugh Entities"), any property or asset owned or possessed in any manner whatsoever by the Peak XV Entities, until further order of the Court;

(7)     Award, on Counts I-VI, a temporary restraining order and, after hearing, a preliminary injunction, enjoining Rakshitt Chugh, individually, and Rakshitt Chugh as Trustee of the RC Family Trust, ARC Capital, LLC, all others in active concert with Chugh, the RC Family Trust, and ARC Capital, LLC , including, without limitation,

any other corporation, partnership or trust, plus all of the agents and attorneys of any of the foregoing (collectively, the "Chugh Entities"), from selling, paying, lending, pledging, encumbering, mortgaging or otherwise transferring in any manner, to any person, corporation, trust or party whatsoever, any property or asset, which Chugh and/or the Chugh Entities owns or has a partial interest in any manner whatsoever, whether in the ordinary course of business or not, with a value equal to or greater than $10,000, until further order of the Court;

(8)     Award, on Counts I and VI, judgment in favor of Trikona Advisers Limited and Asia Pacific Investments Ltd, and against Rakshitt Chugh, individually, and Peak XV Capital Advisers, LLC, Peak XV Capital, LLC, Peak XV GP, LLC and Peak XV Fundamental Value, LP, (collectively the "Peak XV Entities") requiring and mandating that Chugh and the Peak XV Entities hold in constructive trust any and all revenues and/or profits they earned while operating the Peak Entities, and then disgorge such revenues and/or profits to Asia Pacific Investments, Ltd.;

(9)     Award, on Counts I -VI, judgment in favor of Trikona Advisers Limited and Asia Pacific Investments Ltd and against Rakshitt Chugh, individually, and Rakshitt Chugh as Trustee of the RC Family Trust, ARC Capital, LLC, and all others in active concert with Chugh, the RC Family Trust, and ARC Capital, LLC, including, without limitation, any other corporation, partnership or trust in which Chugh or his family have an interest (the "Chugh Entities"), mandating absolute forfeiture of any and all compensation, profit or property owed or to be owed by Trikona Advisers Limited to Rakshitt Chugh, and (the "Chugh Entities"), including, without limitation, any and all right, title and interest that Chugh and/or the Chugh Entities have in the shares, however

held, of Trikona Advisers Limited, such that all such compensation, profit, and shares are absolutely forfeited to Asia Pacific Investments Ltd.;

(10)    Award, on Counts I and VI, judgment in favor of Trikona Advisers Limited and Asia Pacific Investments Ltd, and against Rakshitt Chugh, and Peak XV Capital Advisers, LLC, Peak XV Capital, LLC, Peak XV GP, LLC and Peak XV Fundamental Value, LP, (collectively the "Peak XV Entities"), awarding the shares and all other ownership in the Peak XV Entities to Trikona Advisors Limited and Asia Pacific Investments Ltd;

(11)    Award, on Counts VI, judgment in favor of Trikona Advisers Limited and Asia Pacific Investments Ltd, and against Rakshitt Chug and ARC Capital, LLC, awarding the shares and all other ownership in ARC Capital, LLC,  to Trikona Advisors Limited and Asia Pacific Investments Ltd;

(12)    Award, on Counts VI, judgment in favor of Trikona Advisers Limited and Asia Pacific Investments Ltd, and against Rakshitt Chug and the RC Family Trust, awarding the legal and beneficial interests and all other ownership in the RC Family Trust, to Trikona Advisers Limited and Asia Pacific Investments Ltd;

(13)    Award, on Count VI, judgment in favor of  Trikona Advisers Limited and Asia Pacific Investments Ltd. and against Rakshitt Chugh and Byte Consulting, Inc., awarding the shares and all other ownership in Byte Consulting, Inc. to Trikona Advisors Limited and Asia Pacific Investments Ltd;

(14)    Award, on Count VI, judgment in favor of  Trikona Advisers Limited and Asia Pacific Investments Ltd. and against Rakshitt Chugh, individually, and Peak XV Capital Advisers, LLC, Peak XV Capital, LLC, Peak XV GP, LLC and Peak XV

Fundamental Value, LP, (collectively the "Peak XV Entities"), and Rakshitt Chugh as Trustee of the RC Family Trust, ARC Capital, LLC, and all others in active concert with Chugh, the RC Family Trust, and ARC Capital, LLC, including, without limitation, any other corporation, partnership or trust in which Chugh or his family have an interest (collectively, the "Chugh Entities"), in the amount of actual damages, plus multiple and/or punitive damages, to be determined at trial, plus prejudgment interest, plus costs of suit, including attorneys' fees; and

(15)    Award, on Counts I – XIII, such other and further relief to Trikona Advisers Limited and Asia Pacific Investments Ltd., including equitable relief and/or damages, as this Court deems just and equitable.

**TRIKONA ADVISERS LIMITED, and
ASIA PACIFIC INVESTMENTS LTD.,**
By their attorneys,

Geoffrey W. Millsom | CT BBO No. 411700
Michael C. Gilleran | pending pro hac admission
Brian R. Birke | pending pro hac admission
Erica Mecler Caron | pending pro hac admission
ADLER POLLOCK & SHEEHAN P.C.
175 Federal Street
Boston, MA 02110-2890
T: 617.482.0600
F: 617.482.0604
E: gmillsom@apslaw.com
E: mgilleran@apslaw.com
E: bbirke@apslaw.com
E: emecler@apslaw.com

Dated: December 27, 2011

## VERIFICATION

I, Aashish Kalra, depose and state that I have read the foregoing Verified Complaint, and that the facts stated therein are true to the best of my knowledge, except those stated on information and belief, which I believe to be true on the basis of information and belief.

Signed under the penalties of perjury.

_____
Aashish Kalra

Dated: December 28, 2011